Rockingham
No. 88-061

## MICHAEL D. CANNATA, SR., & a.

### v.

## TOWN OF DEERFIELD & a.

October 6, 1989

*Daniel D. Crean,* of Concord, and *J. P. Nadeau,* of Portsmouth (*Mr. Crean* and *Mr. Nadeau* on the brief, and *Mr. Nadeau* orally), for the plaintiffs, Michael D. Cannata, Sr., Michael D. Cannata, Jr., and Linda J. Cannata.

*Upton, Sanders & Smith,* of Concord (*Russell F. Hilliard* on the brief and orally), for the defendants.

BATCHELDER, J. This case involves disputes between owners of real estate and local government, including its officials in the town of Deerfield where the land is located. The legal residuum of the dispute is a question as to whether the town and/or its officials are immunized, either by statute or common law, from a damage claim occasioned by a culvert positioned in a public way in such a manner as to cause an accumulation of water on the plaintiffs' land. This is the primary issue in the case having colorable merit, but we arrive at it only after an observation of the factual backdrop of these proceedings, the complexity of which is greatly enhanced by

an array of pleadings which, by a wide margin, miss the mark of being exemplars of clarity and precision.

The events which have largely contributed to this litigation are easy to isolate. On August 15, 1980, and July 10, 1981, the town road agent, on behalf of the town, cleaned ditches along the side of Ridge Road. The plaintiffs claim that this activity resulted in the flooding of a portion of their land and the knocking down of a part of a stone wall on their property. Second, the plaintiffs claim that the town's installation and replacement of an eighteen-inch culvert across Ridge Road resulted in further "unnatural backwater flooding." The town denies all these allegations.

The plaintiffs have sued under a five-count, amended complaint. In count one, a constitutional rights claim, the plaintiffs allege that the town's subdivision approval process deprived them of their constitutional rights of due process and equal protection under the Federal and State Constitutions. In counts two and three (water diversion claims), the plaintiffs allege that the defendants, on August 15, 1980, and on July 10, 1981, respectively, intentionally diverted water onto their land and caused damage to a boundary wall on the land. In counts four and five (culvert claims), the plaintiffs allege that the defendants negligently installed a culvert on a town road which caused flooding on their property and later replaced it with another culvert improperly installed at a higher elevation than the previous one, which caused additional flooding on their property. The defendants moved to dismiss the complaint for, *inter alia,* failure to state a claim. The Trial Court (*Gray,* J.) dismissed the constitutional deprivation claim (count one) and the culvert claims (counts four and five) for failure to state a cause of action, but allowed the water diversion claims (counts two and three) to go forward. Subsequently, the Trial Court (*Temple,* J.), approving the recommendations of the Master (*Charles T. Gallagher,* Esq.), granted the defendants' motion for summary judgment on the water diversion claims in counts two and three, except that portion of count two which dealt with the knocking down of the plaintiffs' boundary wall. With but one exception, we affirm the trial courts' orders.

The Cannatas and the Town of Deerfield have been involved in litigation as adversaries in both federal and State court at various times over the nine years preceding this appeal. The source of their dispute has been a parcel of the Cannatas' property for which they sought subdivision approval from the town's planning board in 1979. Although the board initially denied approval, the plaintiffs later obtained subdivision approval as part of a settlement of an

appeal to the superior court. The Cannatas then brought suit in federal court to obtain recovery for what they felt were unconstitutional and unfair proceedings in the subdivision approval process. The federal suit was subsequently dismissed for lack of a substantial federal question.

Following the federal court dismissal, the plaintiffs then filed this suit in superior court against the town, its planning board, its selectmen, and its town clerk. The defendants moved to dismiss the complaint on grounds of, *inter alia,* failure to state a claim and sovereign immunity. The Trial Court (*Bean,* J.) granted the motion in part, after which the plaintiffs moved the court to reconsider. The court granted the motion for reconsideration on the condition that the plaintiffs strike the entire "incomprehensible" complaint and rewrite it to provide for "specific claims in each count without repetition." The plaintiffs filed an amended complaint which is outlined above.

A comparison of the original and amended complaints reveals that the latter, although written somewhat more clearly, makes substantially the same allegations as the former. After the filing of the amended complaint, the defendants made the motions to dismiss and for summary judgment that precipitated this appeal. After the orders were issued on these motions, a nonsuit was taken by agreement on the remaining part of count two to allow for this appeal.

I. *Dismissal of Counts One, Four and Five (Culvert Claims)*

The plaintiffs have withdrawn their appeal of the dismissal of count one, the alleged deprivation of their constitutional rights in the subdivision approval process, in light of this court's decision in *Rockhouse Mt. Property Owners Assoc. v. Conway,* 127 N.H. 593, 503 A.2d 1385 (1986) (declining to adopt damages remedy for alleged constitutional torts caused by town's refusal to lay out roads in subdivision). We first address, therefore, plaintiffs' appeal of the dismissal of counts four and five, the culvert claims. As written in the amended complaint, count four incorporates by reference common factual allegations and, in relevant part, states as follows:

> "The Defendant Town of Deerfield and the members of the Deerfield Board of Selectmen, individually and in their official capacities, negligently or wantonly and maliciously installed or caused to be installed an eighteen-inch corrugated metal pipe culvert across Ridge Road so as to create repeated flooding and flowing of surface water and

run-off over, across and upon Plaintiffs' land in an unnatural and improper manner."

The plaintiffs go on to claim that the culvert installation resulted in a taking of their property and that it generally interfered with the use and enjoyment of their land. Throughout this count, the plaintiffs refer alternatively to both negligent and wanton behavior on the part of the defendants.

Count five similarly refers to both negligent and wanton behavior. This count, in relevant part, states:

"Defendants, Town of Deerfield and the Deerfield Board of Selectmen, individually and in their official capacities, in negligent and wanton disregard of the property rights and interests of the Plaintiffs, caused or allowed to be caused on or about July 1, 1982, the replacement of an existing improperly installed eighteen-inch corrugated metal pipe culvert at a higher elevation than the existing culvert, which wrongfully caused further and repeated additional innundating [sic] of Plaintiffs' land by unnatural backwater flooding, all without any right so to do and all despite previous knowledge of the defects of the prior installation."

The plaintiffs further claim that the officials' behavior has restricted the use of their land, will cause them to incur expenses to correct the water problem, and was in gross disregard of their constitutional rights.

The Trial Court (*Gray*, J.), citing *Win-Tasch Corp. v. Town of Merrimack*, 120 N.H. 6, 411 A.2d 144 (1980) and *Sibson v. State*, 111 N.H. 305, 282 A.2d 664 (1971), dismissed both counts on the ground that the actions of the selectmen, and therefore the town, were protected by the doctrine of quasi-judicial immunity. The court found that the planning and laying out of highways and sewers or drains were within the scope of this immunity. As additional support for his conclusions, the trial judge cited RSA 31:104 (Supp. 1987), which provides immunity for municipal officials who act in their official capacities, in good faith, and within the scope of their authority. The court determined that the plaintiffs' "technique of incorporating in one count the language of both negligent and intentional torts does not preclude the Court from treating the counts properly as negligence claims," and that the negligence and intentional tort theories should have been presented in separate counts. The trial court then found that the complaint contained insufficient allegations of bad faith to support

recovery against the town or its selectmen. In contrast, because counts two and three alleged intentional misconduct, they were not dismissed.

The Cannatas challenge the court's rulings on several grounds. They argue that counts four and five allege acts that are neither quasi-judicial nor within the scope of the selectmen's authority. They further argue that RSA 31:104 (Supp. 1987) provides no protection to the selectmen because counts four and five allege intentional misconduct and therefore bad faith. The plaintiffs also argue that because they have pled in the alternative both negligence and intentional misconduct, only the negligence counts should be dismissed and the allegations of bad faith should remain.

In deciding a motion to dismiss we must, of course, assume that all facts properly pled in the complaint are true and construe all reasonable inferences from those facts in the plaintiff's favor. *Jarvis v. Prudential Ins. Co.*, 122 N.H. 648, 651, 448 A.2d 407, 409 (1982). Viewing the plaintiffs' complaint in this light, we affirm that part of the trial court's order that dismisses counts four and five against the board of selectmen. The trial judge rested his conclusion on the ground that the selectmen's good faith actions in planning and laying out sewers and drains were within the scope of quasi-judicial immunity. The provisions of RSA 31:104, however, provide a more sound basis on which to decide this issue. We agree with the trial court that the complaint, even with its conclusory references to "wanton" conduct by the selectmen, contained insufficient allegations of bad faith to take the claims against the selectmen out of the protection of immunity provided by RSA 31:104.

The plaintiffs protest, however, that the allegations common to all counts establish a pattern of bad faith misconduct directed toward them in response to their vigilant protection of their property rights. We disagree. The common allegations refer to the alleged problems and unconstitutional actions the plaintiffs faced in obtaining approval of their subdivision plans. The common allegations in the complaint do not establish a connection, other than through incorporation by reference, between alleged delays in subdivision approval and the improper installation and replace-ment of a culvert. The complaint does not, for instance, state that the culverts were installed in retaliation for the plaintiffs' bringing suit to obtain subdivision approval. Consequently, the common factual allegations, rather than establishing a pattern of official misconduct pertaining to the culverts, relate to the plaintiffs' claims in count one concerning subdivision approval, which claims were

withdrawn on appeal. The trial court was correct in ruling that, as to the selectmen, counts four and five did not contain sufficient allegations of bad faith for the plaintiff to overcome the immunity hurdle of RSA 31:104.

■ The plaintiffs are simply wrong in their argument that because they have pled both negligence and intentional misconduct, only the negligence aspects of counts four and five should be dismissed. This court agrees with them that pleading in the alternative is an appropriate and effective drafting technique. *See Burley v. Kenneth Hudson, Inc.*, 122 N.H. 560, 563, 448 A.2d 375, 376 (1982). Like the trial court, however, we believe that the plaintiffs should have alleged any intentional counts distinctly, as they did in counts two and three. R. WIEBUSCH, 4 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 226, at 165–66 (1984). This is especially true where, as here, the plaintiffs were given two opportunities to write a clear, comprehensible complaint.

We disagree, however, with the trial court's holding that the immunity which protected the selectmen also protected the town. *Contra Sibson v. State*, 111 N.H. at 309, 282 A.2d at 667 (immunity of State board members extends to State). Case law has recognized that municipalities traditionally have been immune from liability in the construction and maintenance of their highways. *See, e.g., Fournier v. Berlin*, 92 N.H. 142, 144, 26 A.2d 366, 367 (1942) (municipality immune from suit for injuries alleged to be negligently caused during highway construction). Although the issue is not briefed by either party, an exception to this common law immunity exists "if the municipality, by the use of the land which it holds only for public governmental purposes, such as a highway, negligently invades an adjoining owner's property rights." *Allen v. Hampton*, 107 N.H. 377, 378, 222 A.2d 833, 834 (1966); *Clair v. Manchester*, 72 N.H. 231, 55 A. 935 (1903) (town liable for damages caused by inadequate culvert); *Parker v. Nashua*, 59 N.H. 402 (1879) (town liable for damages caused by negligently obstructed culvert). A town's liability may be limited by virtue of the rights that the town purchased when it originally laid out the highway; however, the release the adjoining property owner gave "when the road was laid out included damages arising from its proper construction and maintenance, but not from negligent or unreasonable construction and maintenance." *Hood v. Nashua*, 91 N.H. 98, 101, 13 A.2d 726, 728 (1940); *see also Clair v. Manchester, supra* at 233–34, 55 A. at 936.

■ We note that the cases dealing with this exception to municipal immunity predated our decision in *Merrill v. Manchester*, 114 N.H. 722, 729, 332 A.2d 378, 383 (1974), in which we abrogated municipal immunity except for acts requiring the exercise of a judicial or legislative function and for acts requiring the exercise of an executive or planning function which involved policy decisions characterized by a high degree of official judgment. Although we have held recently that a municipal decision whether or not to lay out a road qualifies for the municipal immunity explained in the *Merrill* case, *see Rockhouse Mt. Property Owners Assoc.*, 127 N.H. at 600, 503 A.2d at 1389, we do not believe that *Merrill*-type immunity bars a claim which alleges that the municipality negligently has invaded an adjoining owner's property rights. The distinction, in our view, is one between providing immunity for a discretionary decision whether to install storm drains and sewers, and not providing immunity for the allegedly negligent manner in which that decision is carried out. In this case, the facts in counts four and five allege that Deerfield's highway construction and maintenance unreasonably have invaded the plaintiffs' property rights. *See Allen v. Hampton supra; Flanders v. Franklin*, 70 N.H. 168, 169, 47 A. 88, 89 (1899). We therefore hold that the trial court improperly dismissed the plaintiffs' claims against the town in counts four and five.

The defendants assert, however, that RSA 507-B:2 and :5 preclude the plaintiffs' claim for property damages. We disagree. RSA 507-B:5 states that no governmental unit shall be held liable for bodily and personal injury or property damage except as provided by this chapter or other statutes. RSA 507-B:2 permits an individual to recover for bodily and personal injury and property damage caused by a town's "ownership, occupation, maintenance, or operation" of all premises except, *inter alia*, public streets and highways. The statute defines property damage as "a loss through injury to, or destruction of, *tangible* property." RSA 507-B:1, IV (emphasis added).

■ We do not believe that the term "tangible property" as used in the statute includes real property. Ballentine's Law Dictionary 1255 (3d ed. 1969) defines tangible property as "[p]roperty which can be possessed physically, such as goods, wares, and merchandise." *See also In re Arbib's Estate*, 216 N.Y.S. 522 (Sur. Ct. 1925) ("[t]angible property is synonymous with 'goods, wares, and merchandise'"). Other sources, however, suggest that tangible property may include both real and personal property. *See* BLACK'S LAW DICTIONARY 1306 (5th ed. 1979); 73 C.J.S. § 15. Historically,

property has been classified into two categories, real and personal, *see* R. CUNNINGHAM, W. STOEBUCK AND D. WHITMAN, *The Law of Property* § 1.4 (1984), but the need to distinguish between tangible and intangible property usually has occurred in the context of determining personal property issues. *See Bills v. Putnam*, 64 N.H. 554, 561, 15 A. 138, 140 (1888) (personal property, in its broadest legal sense, "includes everything the subject of ownership not being land or an interest in land" but, as used in will, and as commonly understood, includes only tangible and moveable things, not intangible items). We will interpret the language of statutes according to their common and approved usage. RSA 21:2; *Appeal of Town of Hampton Falls*, 126 N.H. 805, 809, 498 A.2d 304, 307 (1985). Accordingly, we hold that the statutory term tangible property, as commonly used and understood, refers to tangible personal property, not to real property, and thus RSA 507-B:2 does not bar the plaintiffs' claim in this case.

Further support for this position is found in the legislative history of the statute. As originally enacted, RSA chapter 507-B covered only bodily injury actions. *See* Laws 1975, ch. 483. Six years later, the legislature amended the law to cover personal injury and property damage claims as well. *See* Laws 1981, ch. 376. Taken as a whole, the law seems designed to limit municipal liability arising from tort suits and related personal property claims, not to limit municipal liability arising from nuisance or trespass claims such as are alleged in this case.

We are not persuaded by the dissent's reliance on the legislature's amendment to RSA chapter 507-B for pollutant incident liability to show that by the term tangible property, the legislature meant to include real property. As the dissent itself notes, a pollutant incident is specifically defined as, *inter alia*, a discharge of a pollutant onto "land." RSA 507-B:1, V (Supp. 1988). Far from being conclusive on the issue before us, the definition of, and municipal liability for, a pollutant incident demonstrates that the legislature knew how to include real property in a definition when it intended to do so. The pollutant incident amendment thus highlights the legislature's ambiguous and deficient definition of property damage in RSA 507-B:1, IV.

As a final note on the immunity issue, we agree with the paragraph in the dissent which recommends that the legislature review the municipal liability statute. This court's *Opinion of the Justices*, 126 N.H. 554, 493 A.2d 1182 (1985) held unconstitutional a provision for State immunity which is virtually identical to RSA

507-B:2. The constitutionality of RSA 507-B:2 was not raised in this case, however.

The plaintiffs finally claim that RSA 31:104 and RSA 507-B:2 provide no protection to the town or its selectmen because the culvert installation and replacement effected a taking of the plaintiffs' land. We agree with the plaintiffs insofar as they state that sovereign immunity does not protect the town from paying compensation for a taking of land. *Sibson*, 111 N.H. at 307, 282 A.2d at 665. The complaint, however, does not allege either that the town has deprived the plaintiffs of all economic use of their land or that the value of the land has been substantially destroyed. *See Funtown v. Town of Conway*, 127 N.H. 312, 317, 499 A.2d 1337, 1341 (1985). Despite conclusory references to a taking in counts four and five, the complaint, fairly read, alleges at best a claim for damages resulting from the culvert work. We therefore do not accept the plaintiffs' argument that they properly have alleged a taking.

II. *Summary Judgment on Counts Two and Three (Water Diversion Claims)*

The Trial Court (*Temple*, J.) approved a Master's (*Charles T. Gallagher*, Esq.) report which granted summary judgment for the defendants on all of count three and all of count two except that part concerning the knocking down of the plaintiffs' boundary wall. Counts two and three of the complaint essentially allege that the town and its selectmen intentionally diverted water onto the plaintiffs' property on August 15, 1980, and July 10, 1981, respectively. Both counts also allege that the water diversion damaged the boundary wall on plaintiffs' land. The defendants relied on the affidavit of Keith Rollins, the road agent for the town of Deerfield, in support of their motion, while the plaintiffs submitted affidavits by Michael Cannata, Junior and Senior.

Summary judgment will be granted if the pleadings and affidavits, *inter alia*, on file demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. RSA 491:8-a. The master concluded that the affidavit of Michael Cannata, Jr., did not provide facts showing malice or bad faith on the part of the town or its officials. Rather, the affidavit simply related difficulties the plaintiffs had with the town over subdivision approval and driveway permits. We agree with the master that the affidavit provides no facts from which it can be inferred that the defendants intentionally diverted water onto the plaintiffs' land. Similarly, we agree with the master

that the affidavit of Michael Cannata, Sr., creates a dispute of fact only concerning whether road agent Rollins intentionally damaged the plaintiffs' boundary wall, but not whether water was intentionally diverted onto the plaintiffs' land. Finally, the master concluded that the affidavits establish that damage to the boundary wall occurred only on August 15, 1980, not on July 10, 1981. We agree and therefore affirm the summary judgment order.

Although it is not entirely clear, the plaintiffs seem to argue that summary judgment was inappropriate because they have "massive volumes" of evidence that create an issue of material fact and because the complaint as a whole alleges a taking of property. At oral argument, the plaintiffs also argued that the order was inconsistent because it allowed the claim for intentional damage to the boundary wall but not for the resulting damage caused by the diverted water. These arguments are meritless. If the plaintiffs had "massive volumes" of evidence which would have shown intentional misconduct, they should have presented them to the master in opposition to the defendants' motion. RSA 491:8-a (adverse party's response to motion must set forth specific facts showing issue for trial); *see also ERA Pat Demarais Assoc's v. Alex. Eastman Found.*, 129 N.H. 89, 92, 523 A.2d 74, 76 (1986) (opposing party's affidavit must do more than rely on general denials or statements). The same holds true for the allegation concerning the intentional diversion of water.

As for the taking argument, both counts state that the water diversion deprived the plaintiffs of the reasonable use of their property and also state that the diversion caused damage to their land. The plaintiffs cannot properly claim, in the same count, both a taking and damages for harm to the property which allegedly was taken. Neither the plaintiffs' brief nor their oral argument made clear which cause of action the plaintiffs were proposing. We believe, however, that counts two and three allege primarily a damages claim for harm caused by the town's action. The plaintiffs cannot now use a taking argument to prevent summary judgment for the defendants.

In summary, we affirm the trial court's order dismissing the culvert claims (counts four and five) against the defendant selectmen, but reverse dismissal of those claims against the defendant Town of Deerfield. We also affirm the order granting the defendants summary judgment on the water diversion claims

(counts two and three), except that part of count two relating to damage to the plaintiffs' boundary wall.

*Affirmed in part; reversed in part; remanded.*

SOUTER, J., with whom THAYER, J., joined, dissented; the others concurred.

SOUTER, J., dissenting: I respectfully dissent from the majority opinion insofar as it rejects the town's plea of municipal immunity from any liability to pay damages for negligence as charged in the so-called culvert claims under counts four and five.

As I understand what the majority say in assessing the town's plea of common law immunity, they assume that *Rockhouse Mt. Property Owners Assoc. v. Town of Conway*, 127 N.H. 593, 503 A.2d 1385 (1986) entails the conclusion that under *Merrill v. Manchester*, 114 N.H. 722, 729, 332 A.2d 378, 383 (1974), the town is entitled to immunity on a claim that culverts were negligently placed. They then avoid this result by subjecting the *Merrill* rule to an exception developed under the pre-*Merrill* law of municipal immunity, denying immunity for damage tortiously caused to neighboring property by the municipality's use of its own land. *See Allen v. Hampton*, 107 N.H. 377, 222 A.2d 833 (1966); *Flanders v. Franklin*, 70 N.H. 168, 47 A. 88 (1899). I, however, do not read *Rockhouse* as being obviously controlling, and I believe the majority should assess the town's plea of common law immunity simply by applying *Merrill's* rule that immunity is available for liability arising from "acts and omissions constituting (a) the exercise of a legislative or judicial function, and (b) the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion." *Merrill supra.* I have, moreover, great misgivings about whittling down the holding of *Merrill* with one of the very exceptions that had brought the pre-*Merrill* law close enough to incomprehensibility to require the relief that *Merrill* gave. *See Merrill, supra* at 725–26, 332 A.2d at 381.

For good or ill, however, *Merrill* is no longer the primary touchstone of municipal immunity, since the legislature responded to *Merrill's* invitation to legislative modification, *see Merrill, supra* at 730, 332 A.2d at 384, by adopting RSA chapter 507-B. It is in construing this statute that I find my principal disagreement with the majority, who see in it no source of municipal immunity from the liability asserted in the culvert claims. I believe the majority's

error becomes apparent in light of the history, structure, and text of the statute.

In its original scope, RSA chapter 507-B addressed only municipal liability for bodily injury. *See* Laws 1975, 483:1. It provided that no governmental unit (hereinafter "municipality") below the State level would be liable in any action for bodily injury except to the extent provided by RSA chapter 507-B or some other statute, RSA 507-B:5; and, under a provision headed "Liability for Negligence," it subjected municipalities to monetary liability for bodily injury caused by fault "arising out of ownership, occupation, maintenance or operation" of motor vehicles or of "premises, except public sidewalks, streets, highways or publicly owned airport runways and taxiways," RSA 507-B:2. Further immunity was provided against liability for bodily injury caused by an accident resulting from "inclement weather." *Id.* :2-a. Where recovery was not barred by immunity, it was limited in amount. *Id.* :4.

Following the first, albeit unsuccessful, equal protection challenge to the statute in *Estate of Cargill v. City of Rochester*, 119 N.H. 661, 406 A.2d 704 (1979), *appeal dismissed*, 445 U.S. 921 (1980), the legislature in 1981 expanded the applicability of the chapter to actions for "personal injury" and "property damage," Laws 1981, 376:1; RSA 507-B:2. The amending legislation defined "personal injury" as including, *inter alia*, injury to an individual's reputation, invasion of the right to occupy premises, and injury to "intangible property sustained by any organization" resulting from certain listed torts such as false eviction. RSA 507-B:1, III(a) and (b). It defined "property damage" as "injury to, or destruction of, tangible property." Laws 1981, 376:1; RSA 507-B:1, IV.

Following the 1981 amendments, then, the statute provided that a municipality could be held liable for bodily injury, personal injury or property damage only to the extent provided by RSA chapter 507-B or some other statute. RSA 507-B:5. And that extent was defined by the dollar recovery limitation, *id.* :4; by the implicit exclusions of liability not arising from "fault" or from premises or motor vehicles; and by express exceptions related to bad weather, *id.* :2-a, sidewalks, streets, highways, and public airport runways and taxiways, *id.* :2, I.

As I read the plaintiffs' brief, they are trying to suggest that there is no statutory immunity in this instance because the property damage in question does not arise "out of ownership, occupation, maintenance, or operation of [a] public . . . highway[.]" Although the majority do not dwell on this suggestion, I share the assumption that the majority evidently make, that the quoted language is broad

enough to include references to the placement of culverts necessitated by a highway's barrier to normal flowage, and I would accordingly reject the plaintiffs' position.

The majority nevertheless proceed to deny any statutory municipal immunity arising out of highway maintenance by holding that damage to real property is not "property damage," or damage of any other kind recognized by the statute. Thus, the majority hold that the statute has no application to damage to land, liability for which, on their view, remains entirely unregulated by any dollar limit on recovery or by any statutorily recognized immunity. In this I believe they are mistaken.

The majority reach this result because "property damage" is defined as "injury to, or destruction of, tangible property," RSA 507-B:1, IV, which the majority equate with "personal property," to the exclusion of real property, or land. The majority's own citations, however, undercut this equation. While they cite a dictionary definition and one case as authority for defining "tangible" as "personal," they recognize another dictionary definition and a legal encyclopedia that include real as well as personal property within the scope of what is "tangible." The only reliable inference that can be drawn from these examples is that citations in the abstract are not helpful guides to what the legislature meant in defining "property" as "tangible."

As this court has explained many times, however, the sound way to seek the "legislature's manifest intent," RSA 21:1, in choosing its vocabulary is to examine the text of the entire statute considered as a whole, see *Carter v. City of Nashua*, 116 N.H. 466, 468, 362 A.2d 191, 193 (1976). When we do read the statute whole, one of the most salient facts about its text is that although "property" is equated with "tangible" property, "tangible" property is never defined as "personal" property. If we then ask why "tangible" was used at all, the answer is apparent from the express terms of the preceding definition of "personal injury," as including damage to "intangible property." RSA 507-B:1, III. The only "manifest" legislative intent, therefore, was to avoid overlapping the definitions of "personal injury" and "property damage." But in taking care to avoid overlapping, the legislature manifested no intent to exclude damage to real estate from the scope of "property damage" as a subject addressed by the statute.

The consequent improbability, on the basis of the text, that the legislature meant to exclude liability for damage to land from the regulatory scope of the statute is recognized in the only published commentary addressing the statute's scope after its 1981 amend-

ment, in which the writer concludes that "[t]he chapter broadly defines the terms bodily injury, personal injury and property damage to include recovery for virtually all tortious injuries." Luster, *Municipal Liability After Tort Reform*, 28 N.H.B.J. 187, 188 (1987). This conclusion is consistent with such scant legislative history as there is, which includes a brief statement by a member of the House Judiciary Committee to the full House, explaining the relevant portion of the 1981 amendment as relating simply to "property damage," without any indication that the entire category of damage to real estate would be left unregulated by the resulting statute. N.H.H.R. JOUR. 481 (1981).

There is, moreover, a further item of evidence supporting my view that "tangible" property was meant to include real estate, in the text of a later piece of legislation confirming beyond any doubt that the legislature assumed that the 1981 amendment had subjected liability for damage to land to the immunity and limitations on recovery provided by the statute. This evidence is found in the text of the third significant amendment to RSA chapter 507-B. In 1986, the chapter was made expressly applicable to municipal liability for damage caused by a "pollutant incident," defined generally as the transfer of pollutants "into or upon land, the atmosphere, or any watercourse or body of water." Laws 1986, 227:9; RSA 507-B:1, V (Supp. 1988). Thus, one variety of "pollutant incident" is damage to land by polluting it.

The legislature proceeded to regulate municipal liability for pollutant incidents such as this by enacting what is now RSA 507-B:9 (Supp. 1988). Laws 1986, 227:10. This section performs several functions. It establishes a standard of liability, RSA 507-B:9, I (Supp. 1988); it regulates the apportionment of responsibility among multiple tortfeasors, *id.* :II; and it bars strict or absolute liability for such damage or injury, *id.* :III. In each instance, however, the standard of liability, the apportionment of damages, and the bar to liability without fault are expressly enacted with respect to liability for "personal injury, bodily injury, or property damage." These are, of course, the standard terms as defined in RSA 507-B:1. If, then, the majority are correct that "property damage" does not include damage to land, it follows that the 1986 amendments have no effect in defining, apportioning or otherwise regulating municipal liability for land contamination.

It is not, however, reasonably conceivable that such was the legislature's view, for if the legislature had not assumed that the 1986 enactments would affect municipal liability for land pollution, there would have been no point in expressly defining a pollutant

250

incident to include the transfer of pollutants "into or upon land." RSA 507-B:1, V (Supp. 1988). My argument is not, of course, that subsequent legislation enjoys the status of legislative history of an earlier act, but that the legislature's obvious assumptions about what it had earlier enacted should lead the majority to pause before they dismiss the analysis of the text that I set out above. *See In re Robert C.*, 120 N.H. 221, 225, 412 A.2d 1037, 1040 (1980) (doubtful statutory language may be construed in accordance with a legislative intent evinced by a later amendment).

I would therefore hold that RSA chapter 507-B is applicable to municipal liability under count five. I would also require the trial court to ascertain the date of the tortious acts alleged under count four, to determine whether the 1982 extension of the statute to cover liability for property damage would also apply to that count.

Despite my disagreement with so much of the majority opinion on the culvert claims, I do not underestimate that opinion's importance. For quite apart from its present effect on the town of Deerfield, the majority view should be seen as advice to the legislature that a significant element of potential municipal liability, including liability for land pollution, must receive further legislative attention if it is to become subject to the regulation of RSA chapter 507-B.

THAYER, J., joins in the dissent of SOUTER, J.