Merrimack
No. 2008-025

TARBELL ADMINISTRATOR, INC., TRUSTEE OF THE TARBELL FAMILY
REVOCABLE TRUST OF 2003

v.

CITY OF CONCORD

Argued: June 26, 2008
Opinion Issued: September 12, 2008

*Tarbell & Brodich Professional Association,* of Concord (*Friedrich K. Moeckel* on the brief and orally), for the plaintiff.

*Ransmeier & Spellman Professional Corporation,* of Concord (*Charles P. Bauer* and *John T. Alexander* on the brief, and *Mr. Alexander* orally), for the defendant.

DUGGAN, J. The plaintiff, Tarbell Administrator, Inc., as trustee of the Tarbell Family Revocable Trust (Tarbell), appeals an order of the Trial Court (*Conboy,* J.) granting summary judgment in favor of the defendant, City of Concord (City). We hold that the doctrine of discretionary function immunity bars Tarbell's negligence claims alleging that the City failed to

properly construct a dam and failed to properly control and regulate the water level, but does not preclude Tarbell's remaining claims. Accordingly, we affirm in part, reverse in part, and remand.

The record supports the following relevant facts. Tarbell owns a twenty-one unit apartment building on North State Street in Concord (the property). Rattlesnake Brook flows under and through the property by a channel and exits through a culvert.

Since 1872, Penacook Lake has served as a municipal water supply source for the City. The City manages and operates a water treatment facility adjacent to the lake. An earthen dam and reservoir located between the lake and Rattlesnake Brook draws water into the treatment facility. Removable flashboards on the top of the dam allow the City to control the level of water in the lake. If the lake's water level exceeds capacity, an emergency spillway provides an outlet for the excess water and prevents a breach of the dam. Water from the emergency spillway flows directly into Rattlesnake Brook. If the lake's water level becomes too low to meet the city's needs, the City pumps water into the lake from the Contoocook River.

In 2003, after experiencing several years of drought-like conditions, the City hired an expert to conduct a Water Supply Sustainable Yield & Drought Management Study. The expert determined a target elevation level for the lake and created a Reservoir Management Model (RMM) to guide the City in deciding when it should pump water from the river to maintain an adequate water supply. In December 2004, the Concord City Council adopted and implemented the RMM.

The City followed the RMM guidelines for approximately one year. In October 2005, the city experienced unusually heavy rainfalls. At the time, pursuant to the RMM, the city was scheduled to pump water from the river into the lake in January 2006. However, because the lake was at an unseasonably high level, on December 29, 2005, the superintendent of the Water Treatment Plant, James Donison, again consulted the expert. On January 6, 2006, the expert advised the City to deviate from the RMM and refrain from pumping water into the lake that month. The City followed this advice.

On January 17, 2006, the expert advised the City that "special attention" needed to be given to: (1) assessing whether total or partial removal of the flashboards was necessary "in anticipation of a large run off event"; (2) inspecting the downstream channel "to review . . . what may create a hazard just in case a significant outflow were to occur" since the channel "may tend to become a dumping ground for debris etc. when flow does not typically occur"; and (3) inspecting the culverts to "confirm their integrity." At that time, the level of the lake was 185 feet, one foot above the target level.

According to the affidavits of Donison and Philip Bodeau, the deputy director of the City's General Services Department during the time in question, the City decided not to remove the boards after analyzing how to best strike a balance between maintaining the target lake level, the anticipated peak summer water demands, the potential lack of rainfall conditions which would lower the lake level, and protecting downstream property owners. Additionally,

> [in] reaching the decision, [the City] considered the following drawbacks to removing the boards: (a) the loss of large amounts of a valuable resource (i.e., City water); (b) the fact that when the boards were removed, water certainly would have rushed down the spillway; (c) the fact that there was no way to predict when the boards could be replaced because the spillway would have to be dry before this occurred; . . . (d) if the boards were removed and left out for an unspecified period of time, this would not have prevented a large run-off event during unusually heavy rains[; and (e)] the expensive costs of pumping water from the [river] to the [lake] in the event lack of rainfall occurred and the lake level was low.

In May 2006, New Hampshire endured a record amount of rainfall. Consequently, the lake's water spilled over the emergency spillway and into Rattlesnake Brook, resulting in severe water damage to the property. Tarbell subsequently filed this action against the City, asserting claims of: (1) negligence for failure to properly construct the dam (count I); (2) negligence for failure to properly maintain the drainage system (count II); (3) negligence for failure to properly control and regulate water (count III); (4) trespass (count IV); and (5) nuisance (count V).

The City moved for summary judgment, arguing that it was entitled to discretionary function immunity for its decisions regarding the proper management of the lake, water treatment plant, and spillway. On November 13, 2007, the trial court issued an order, in which it found:

> [T]he decisions to refrain from pumping water and to leave the flashboards in place do not reflect a lack of deliberation or discretion. Rather, these decisions show that a concentrated effort was made to best protect and contain the City's water supply. . . . [The affidavits submitted by the City] indicate that city officials considered multiple economic and social factors with regard to the decisions made concerning the pumping of water and the potential removal of the flashboards. . . . In sum, city officials considered and weighed alternatives, exercised official judgment and discre-

tion, and made basic policy decisions concerning water supply issues. The plaintiff's alleged injuries arise from those decisions.

Based upon these findings, the trial court ruled that the City was entitled to discretionary function immunity and granted the City's motion for summary judgment on all counts. After the trial court denied its motion for reconsideration, Tarbell filed the instant appeal. On appeal, Tarbell argues that the trial court erred in ruling that the City was entitled to discretionary function immunity as to all counts in the complaint.

In reviewing a trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Carter v. Concord Gen. Mut. Ins. Co.*, 155 N.H. 515, 517 (2007). If our review of the evidence does not reveal any genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the trial court's decision. *Id.* We review the trial court's application of the law to the facts *de novo. Id.*

Tarbell argues first that the trial court erred in applying discretionary function immunity to count III, which alleges that the City negligently invaded its property by "not properly releas[ing] the waters of Penacook Lake." Tarbell asserts that the court was required to analyze its claim under *Cannata v. Town of Deerfield*, 132 N.H. 235 (1989), which, Tarbell further contends, held that a municipality is always liable if it, "by the use of the land which it holds only for public governmental purposes, . . . negligently invades an adjoining owner's property rights." *Cannata*, 132 N.H. at 241.

Resolution of this argument requires a brief review of our municipal immunity jurisprudence. Initially, the doctrine of municipal immunity was a creature of the judiciary, *City of Dover v. Imperial Cas. & Indemn. Co.*, 133 N.H. 109, 112 (1990), and was premised upon the notion that " '[i]t is better that an individual should sustain an injury than that the public should suffer an inconvenience,' " *Gossler v. Manchester*, 107 N.H. 310, 312 (1966) (quoting *Russell v. Men of Devon*, 2 Term Rep. 667, 100 Eng. Rep. 359 (1789)). Historically, it insulated municipalities "from liability for torts arising out of negligence in the performance of governmental functions." *Opinion of the Justices*, 101 N.H. 546, 548 (1957). However, to alleviate the harshness of the results produced by municipal immunity, our cases distinguished between municipal functions that were "governmental with immunity on the one hand, and proprietary with liability on the other hand." *Gossler*, 107 N.H. at 315 (*Kenison*, J., dissenting). In practice, this

often artificial distinction produced results that were not only "confused, inconsistent and difficult," *id.*, but absurd, *see Gilman v. Concord*, 89 N.H. 182, 185-87 (1937).

The confusion engendered by the rules for applying municipal immunity, as well as concerns over the continued validity of the doctrine's underlying premise, caused us to acknowledge the persuasiveness of arguments for the doctrine's abrogation in *Gossler*, 107 N.H. at 314. In that case, we observed that "[t]he rule against municipal liability for torts has been the subject of thousands of pages of learned dissertations, and the flood of legal articles and comments castigating the reasoning embodied in the justification of its continuance continues unabated." *Id.* at 311. However, although we noted that "the complexities of modern government may from time to time require some relaxation of our rule of governmental immunity," *id.* at 314, the majority in *Gossler* declined to abandon the doctrine because opening the door to municipal liability could produce "nearly catastrophic" financial difficulties, *id.* at 313, and, thus, "the scope of municipal liability . . . is a matter for legislative rather than judicial determination," *id.* at 315.

■ Subsequent to *Gossler*, an increasing number of states began acknowledging the lack of administrative or fiscal reasons for retention of the doctrine of municipal immunity and a major trend developed towards its abolition. *Merrill v. Manchester*, 114 N.H. 722, 729 (1974). Following several failed attempts by the legislature to enact legislation addressing the scope of the doctrine, we were asked to reconsider the issue in *Merrill*. *Id.* at 727. *Merrill* first noted that municipal immunity had been amended and eroded to such an extent that all "that remains is an abstract and confusing principle which finds literally no continuity between jurisdictions." *Id.* We then expressed concern that the doctrine is "contrary to the basic concept of the law of torts that liability follows negligence and that individual corporations are responsible for the negligence of their agents, servants and employees in the course of their employment." *Id.* at 725. Because we could find "no supportable rationale upon which this judicially created exception to the ordinary rules of liability c[ould] be predicated," we held that it was "just and reasonable that a change be made from *our previous holdings* as to municipal immunity." *Id.* at 729 (emphasis added). Accordingly, we concluded:

> that the immunity from tort liability heretofore judicially con-
> ferred upon cities and towns is hereby abrogated except for the
> following exception. They are immune from liability for acts and
> omissions constituting (a) the exercise of a legislative or judicial
> function, and (b) the exercise of an executive or planning function

> involving the making of a basic policy decision which is character-
> ized by the exercise of a high degree of official judgment or
> discretion.

*Id.*

■ The discretionary function immunity left intact by *Merrill* is pre-
mised upon the notion that "certain essential, fundamental activities of
government must remain immune from tort liability so that our govern-
ment can govern." *Hacking v. Town of Belmont*, 143 N.H. 546, 549 (1999)
(quotations and brackets omitted). In other words, it seeks to "limit judicial
interference with legislative and executive decision-making," *Schoff v. City
of Somersworth*, 137 N.H. 583, 590 (1993), because "[t]o accept a jury's
verdict as to the reasonableness and safety of a plan of governmental
services and prefer it over the judgment of the governmental body which
originally considered and passed on the matter would be to obstruct normal
governmental operations." *Gardner v. City of Concord*, 137 N.H. 253, 256
(1993). Thus, the doctrine is "tailored to satisfy the underlying policy of
preserving and respecting our system of separation of powers." *Everitt v.
Gen. Elec. Co.*, 156 N.H. 202, 214 (2007).

Since *Merrill*, several opinions have addressed the scope of municipal
immunity. For instance, we have held that immunity exists for a munici-
pality's decisions concerning: whether to lay out roads, *Rockhouse Mt.
Property Owners Assoc. v. Town of Conway*, 127 N.H. 593, 600 (1986); the
location of parking spaces, *Sorenson v. City of Manchester*, 136 N.H. 692,
694 (1993); the placement or subsequent abandonment of an alleyway on a
certain street in a certain place, *Gardner*, 137 N.H. at 258; traffic control,
*Bergeron v. City of Manchester*, 140 N.H. 417, 422, 424 (1995); and the
training and supervision of basketball coaches and referees, *Hacking*, 143
N.H. at 550.

Each of the foregoing cases adhered to the discretionary function
analysis in ascertaining whether or not the municipality was entitled to
immunity from negligence claims. Tarbell nevertheless maintains, relying
upon *Cannata*, that the test for discretionary function immunity articulated
in *Merrill* is inapplicable to its claim in count III that the City negligently
invaded its property.

To the extent that Tarbell argues that *Cannata* altered, in any manner,
the comprehensive test provided in *Merrill*, we disagree. In *Cannata*, we
noted that, prior to *Merrill*, case law had recognized an exception to the
immunity municipalities had enjoyed "in the construction and maintenance
of their highways" for situations where "the municipality, by the use of the
land which it holds only for public governmental purposes, . . . negligently
invades an adjoining owner's property rights." *Cannata*, 132 N.H. at 241.

We then explained that the immunity provided in *Merrill* does not necessarily shield a municipality from such claims because there is a distinction "between providing immunity for a *discretionary decision* whether to install storm drains and sewers," as required by *Merrill*, "and not providing immunity for the *allegedly negligent manner in which that decision is carried out*," as was being alleged by the plaintiffs in *Cannata. Id.* at 242 (emphases added); *compare Hurley v. Hudson*, 112 N.H. 365, 369 (1972) (holding that a "planning board's *approval* of [a] subdivision plan without adequate drainage facilities . . . is precisely the type of" discretionary decision entitled to immunity (emphasis added)), *with Allen v. Hampton*, 107 N.H. 377, 378 (1966) (holding that a municipality is not entitled to immunity for its negligence in *constructing and maintaining* a highway). In other words, we did not create an exception to the rule in *Merrill*, but rather explained our understanding of the prior case law and how it comports with the modern rule.

■■ Moreover, unlike the plaintiffs in *Cannata* who were challenging the "negligent manner in which [a] decision [wa]s carried out," *Cannata*, 132 N.H. at 242, Tarbell is asserting in count III that the City's decision not to lower the water in the reservoir was itself negligent. While "[w]e have refused to adopt a bright line rule to determine whether conduct constitutes discretionary planning or merely the ministerial implementation of a plan," *Hacking*, 143 N.H. at 549-50, the discretionary nature of the City's decision to not remove the flashboards is clear. In making this decision, the City had to weigh competing economic and social factors, including "the expensive costs of pumping water from the [river] to the [lake] in the event [of a] lack of [future] rainfall" and protecting downstream property owners. Policy decisions of this nature, which "involv[e] the consideration of competing economic, social, and political factors," *Mahan v. N.H. Dep't of Admin. Services*, 141 N.H. 747, 750 (1997), are precisely the type of municipal planning that discretionary function immunity seeks to protect. *See Gardner*, 137 N.H. at 257 (explaining that conduct that is "characterized by the high degree of discretion and judgment involved in weighing alternatives and making choices with respect to public policy" is entitled to immunity). This is also the type of claim that Justice Souter expressed concern about in his dissent in *Cannata. See Cannata*, 132 N.H. at 246 (*Souter*, J., dissenting). Subjecting the City to potential liability for a negligence claim in response to this decision would be tantamount to judicial interference with legislative or executive decision-making. *See Everitt*, 156 N.H. at 214. Accordingly, we hold that the City is entitled to summary judgment as a matter of law on count III.

Tarbell argues that, even if the City is entitled to immunity on count III, the trial court erred in granting summary judgment to the City on the remaining counts. The City counters that discretionary function immunity also bars the remaining claims. Rather than individually address each remaining count, the City asserts that "[a]ll five counts are restated versions of the claim that the City's plan for managing reservoir run-off was deficient," and, thus, discretionary function immunity applies to all five counts. Alternatively, the City contends that the trial court correctly granted summary judgment to the City on all counts because Tarbell, in opposing the City's summary judgment motion, failed to provide facts or evidence supporting its remaining claims.

In the first paragraph of its order, the trial court set forth Tarbell's claims, and stated that the City had moved for summary judgment "on all counts." The court later explained that the City was "arguing that it [wa]s shielded from liability for its decisions in managing [the lake], the water treatment plant, and the spillway, pursuant to the doctrine of discretionary function immunity." Ultimately, the trial court found that "the City engaged in discretionary decision-making with regard to management of the dam and the water supply," and, because Tarbell's "alleged injuries ar[ose] from those decisions, . . . the City's acts and/or omissions . . . are shielded by discretionary function immunity."

The trial court, however, did not independently examine each of Tarbell's claims. Rather, the court appears to have granted summary judgment to the City on all counts because it found that all of Tarbell's claims were based upon the City's decisions concerning "management of the dam and the water supply" between January and May 2006. This language appears to summarize count III discussed above, which alleges that the City's "maintenance and regulation of the water flow through the [d]am unreasonably invaded [Tarbell]'s property rights." We disagree with the trial court that, because the City's decisions regarding the "management of the dam and the water supply" were entitled to discretionary function immunity, the City was also entitled to summary judgment on Tarbell's remaining claims.

Count I alleges that the City "unreasonably invaded [Tarbell]'s property rights" by failing to construct a second outlet for the lake. In granting summary judgment on this claim, the trial court considered only whether the City's decisions concerning the "management of the dam and the water supply" between January and May 2006 were entitled to discretionary function immunity. Tarbell's claim in count I, however, does not relate to a particular time frame, but instead alleges that at the time the City constructed the dam, it should have constructed more than one outlet. Thus, the trial court should not have granted summary judgment on count

I based upon its finding that the City's decisions regarding the "management of the dam and the water supply" were entitled to discretionary function immunity.

However, because discretionary function immunity bars count I for another reason, we uphold the trial court's grant of summary judgment on this count. *See Handley v. Town of Hooksett*, 147 N.H. 184, 189-90 (2001) ("This court will sustain the decision of the trial court if there are valid alternative grounds to support it."). Rattlesnake Brook provides the sole outlet for the lake. The City's decision to construct the dam in this fashion constitutes a planning decision requiring the City to make choices as to the manner in which to construct the dam in light of its goal of providing an adequate water supply. *Cf. Hurley*, 112 N.H. at 369. In so doing, the City needed to weigh the benefits and drawbacks of constructing a dam with only one outlet, including considering the potential impact of this type of construction upon both the neighboring property owners and the City's financial circumstances. Accordingly, the City's decision to construct the dam in this particular fashion is characterized by a high degree of discretion and judgment, and, as such, the City is entitled to immunity on the negligence claim asserted in count I.

Count II alleges that the City "unreasonably invaded [Tarbell]'s property rights" by "failing to adequately maintain its water storage systems and outlets thereto"; specifically, by failing to maintain Rattlesnake Brook and the culvert through which the brook flows. This claim, however, is not a restated version of Tarbell's claim that the City was negligent in failing to properly control and regulate the water level, and does not concern the management of the dam and water supply. Rather, Tarbell alleges that the City's failure to clean out the debris that had collected in Rattlesnake Brook and the culverts obstructed the flow of water and caused damage to Tarbell's property. Thus, the City is not shielded from liability on count II based upon the trial court's finding that the City's decisions concerning the management of the dam and water supply are entitled to immunity.

Furthermore, the City has not asserted and the trial court did not find that the City has a plan or policy concerning the maintenance of the drainage systems. In the absence of such a plan or policy, the City's alleged failure to maintain the drainage systems does not, as alleged, qualify as a discretionary function entitled to immunity. *See Cannata*, 132 N.H. at 241. Therefore, discretionary function immunity does not preclude count II.

Counts IV and V allege claims for intentional trespass and private nuisance, respectively. These allegations are not restated versions of the

negligence claim asserted in count III. The trespass claim alleges that the City deliberately invaded the property. The private nuisance claim asserts, *inter alia*, that the City used its property in an unlawful or unreasonable manner. Accordingly, the trial court should not have granted summary judgment on counts IV and V on the grounds that the City's decision concerning the management of the dam and water supply was entitled to discretionary function immunity.

■ Moreover, municipalities have long been held liable for such claims. *See Ferguson v. Keene*, 111 N.H. 222, 224 (1971) ("a municipality is liable as any other owner if the use of its property results in a nuisance"); *O'Brien v. Derry*, 73 N.H. 198, 204 (1905); *Rhobidas v. Concord*, 70 N.H. 90, 110-11 (1899); RESTATEMENT (SECOND) OF TORTS § 895C comment *e* at 409 (1979); 4 J. MARTINEZ & M. LIBONATI, LOCAL GOVERNMENT LAW §§ 27.04, 27.05 (2006); 18 E. MCQUILLAN, MUNICIPAL CORPORATIONS §§ 53.02.10, at 151-52, 53.04.10, at 187, 53.11, at 280-83, 53.13, at 285, 53.59.10, at 471, 53.59.40, at 478-87 (3d ed. rev. 2003). "The actionability of intentional infliction of harm to property interests, like inverse condemnation, [trespass,] and the concept of nuisance, has constitutional underpinnings in the restraint on the taking of private property for public use without just compensation." 4 J. MARTINEZ & M. LIBONATI, *supra* § 27.04; *see also Gilman*, 89 N.H. at 186; 18 E. MCQUILLAN, *supra* § 53.02.10, at 151-52 ("The nuisance exception is grounded in the beliefs that (1) a nuisance involving an invasion of private property resembles an unconstitutional taking, and (2) creating a state of affairs dangerous to life and limb goes significantly beyond mere negligence."); *cf. Gilman v. Laconia*, 55 N.H. 130, 137-38 (1875). As a result of the constitutional implications of such claims, "[w]hile a municipality enjoys immunity for its exercise of discretion and judgment in the development of a . . . plan, such immunity does not protect it from liability for the creation of a nuisance or actual trespass." *Pinkowski v. Township of Montclair*, 691 A.2d 837, 844 (N.J. Super. Ct. App. Div. 1997) (citations omitted); *cf. Gooden v. City of Atlanta*, 531 S.E.2d 364, 366 (Ga. Ct. App. 2000); *Asiala v. City of Fitchburg*, 505 N.E.2d 575, 578 (Mass. App. Ct. 1987); *Paduch v. City of Johnson City*, 896 S.W.2d 767, 772 (Tenn. 1995).

■ Thus, in this case, where Tarbell alleges that the City's actions in creating a private nuisance, *see Heston v. Ousler*, 119 N.H. 58, 60-61 (1979), and intentionally trespassing upon the property amount to a physical taking of the property, *cf. Gilman*, 55 N.H. at 137-38, discretionary function immunity does not bar these claims. To hold otherwise would require an expansion of the scope of immunity, rather than limit such immunity, as *Merrill* intended. *See Merrill*, 114 N.H. at 729-30; *see also Everitt*, 156

N.H. at 214 (refusing to expand the scope of discretionary function immunity and explaining that "[a]s the last remnant of common law municipal immunity, the exception was tailored to satisfy the underlying policy of preserving and respecting our system of separation of powers"). Indeed, "[t]he prevailing rule of torts today is that where there is negligence by an individual or a corporation[,] liability follows. Immunity is the rare exception." *Merrill*, 114 N.H. at 728 (citations omitted). The City therefore is not automatically absolved from liability on Tarbell's claims of intentional trespass and private nuisance. *See generally* Cooperrider, *The Court, The Legislature, and Governmental Tort Liability in Michigan*, 72 MICH. L. REV. 187, 238-49 (1973).

Although counts II, IV, and V survive because they are not barred by discretionary function immunity, we express no opinion as to the validity or viability of these claims. For the purposes of this appeal, in its motion for summary judgment, the City argued *only* that the doctrine of discretionary function immunity barred Tarbell's claims. Therefore, to the extent that counts II, IV, and V are not properly pled, unsupported by facts or evidence, or otherwise unsound, because the City did not request summary judgment on any basis other than discretionary function immunity, we do not consider whether such alternative grounds would support the trial court's grant of summary judgment on these counts.

In conclusion, we emphasize that "the legislature has authority to specify the terms and conditions of suit against cities and towns, limit the amount of recovery, or take any other action which in its wisdom it may deem proper." *Merrill*, 114 N.H. at 730 (citation omitted). Thus, as other state legislatures have done, *see generally* 18 E. MCQUILLAN, *supra* §§ 53.02.10, at 154-58, 53.02.20, at 159-66, our legislature is free to adopt a more comprehensive scheme delineating the boundaries of municipal liability.

We affirm the trial court's grant of summary judgment to the City on counts I and III, reverse the court's grant of summary judgment on counts II, IV, and V, and remand for proceedings consistent with this opinion.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.