NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2018 VT 64

No. 2017-158

| | |
|---|---|
| Keith & Jackie Lorman, Charles & Melissa Gallagher, and Daniel & Alicia Daly | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, Civil Division |
| City of Rutland | November Term, 2017 |

Helen M. Toor, J.

Karl C. Anderson of Anderson & Eaton, P.C., Rutland, for Plaintiffs-Appellants.

Marikate E. Kelley and Philip C. Woodward of Woodward & Kelley, PLLC, North Ferrisburgh, for Defendant-Appellee.

PRESENT: Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Wesley, Supr. J. (Ret.), Specially Assigned

¶ 1. **REIBER, C.J.** Plaintiffs sought relief from the City of Rutland after suffering sewage backups in their homes. The trial court granted summary judgment to the City, concluding that plaintiffs failed to adequately support their negligence, nuisance, trespass, and constitutional takings claims. Plaintiffs appeal, arguing that they produced sufficient evidence to survive summary judgment. We affirm the court's decision.

¶ 2. The following facts are undisputed unless otherwise noted. Plaintiffs live on Butterfly Avenue in the City of Rutland. The City's sewage/stormwater system is over 100 years old. Two combined sewer/stormwater lines run under plaintiffs' street. Originally, these pipes consisted of a 12-inch vitrified clay pipe on the western line and a parallel 15-inch vitrified clay

pipe on the eastern line. In 1987, the City conducted a video inspection of the pipes, which showed that the pipes were cracked, structurally unsound, and that they had significant root intrusion. The following year, based on the root intrusion, engineering recommendations, and financial considerations, the City undertook a so-called slip-lining process that inserted polyethylene sleeves of lesser diameter through the clay pipes. It slip-lined the 12-inch clay pipe on the western line with a 9-inch polyethylene pipe, and it slip-lined the 15-inch clay pipe on the eastern line with a 12-inch polyethene pipe.

¶ 3. In May 2014, the City experienced an extremely intense rain and hail storm, accompanied by high winds; 1.3 inches of rain fell in just fifteen minutes. The total rainfall was 1.65 inches. The flow rate at the City's main sewer interceptor rose instantly from approximately 7 million gallons per day (MGD) to almost 70 MGD, and the storm caused 3 million gallons of combined wastewater (domestic sewage and stormwater) to overflow to receiving streams. That day, the City's combined sewer/stormwater line also backed up into the basements of plaintiffs' homes causing property damage.

¶ 4. In January 2015, plaintiffs sued the City, asserting that it had been negligent in the design, construction, and/or maintenance and repair of the City's public sewer lines. Plaintiffs also raised nuisance, trespass, and constitutional takings claims. With respect to their negligence claim, plaintiffs alleged that the City had not acted reasonably or prudently in designing the lines and in deciding to slip-line them in 1988. They further asserted that the City had a duty to keep and maintain the lines in a reasonably safe and proper condition for the public's use and benefit. Plaintiffs sought damages as well as injunctive relief requiring the City to remedy the storm/wastewater system near their property to prevent future damages.[1]

---

[1] Plaintiffs also sought punitive damages but later acknowledged that they were not entitled to such damages.

2

¶ 5. The City moved for summary judgment. In addition to the facts recited above, the City produced evidence that it has had an excessive number of combined storm/sewer overflows due in part to the age of its infrastructure and that it has limited resources in addressing these issues. The City also noted that the state and the federal governments imposed significant regulatory constraints on its actions and priorities, which was one of many factors that influenced the City's decisions regarding the use of its limited funds. Plaintiffs' expert agreed that deciding the priority of projects was a matter of discretion and that such decisions involved the exercise of judgment and the weighing of technical merit and available resources. Based on these and additional proffered facts, the City maintained that it was entitled to summary judgment on numerous grounds, including immunity and plaintiffs' failure to establish causation for the negligence and nuisance claims.

¶ 6. Plaintiffs opposed the motion, submitting an affidavit from their expert engineer to supplement the expert's deposition testimony. With respect to their negligence claim, plaintiffs argued that they had produced evidence to show that the cause of the sewage backup in their homes was a combination of a bend in the westernmost pipe and a reduction in flow caused by the slip-lining. The parties disagreed about the degree of the bend in the pipe; they also disagreed whether the slip-lining had reduced the water flow given the root intrusion and other issues with the pre-1988 pipes. Plaintiffs also challenged the City's position regarding their nuisance, trespass, and takings claims.

¶ 7. In an April 2017 order, the court granted summary judgment to the City. It concluded that plaintiffs could not establish causation for purposes of their negligence claim. It thus did not reach the City's remaining arguments regarding this claim. Given the absence of causation, the trial court also rejected plaintiffs' nuisance claim. As to trespass, the court found that plaintiffs needed to show an intentional act and that there was no such allegation or evidence

3

of that here. Finally, the court found that plaintiffs failed to present sufficient evidence to support their takings claim. This appeal followed.

¶ 8. We review a grant of summary judgment using the same standard as the trial court. Richart v. Jackson, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a). "When a defendant moves for summary judgment, [it] satisfies [its] legal burden by presenting at least one legally sufficient defense that would bar plaintiff's claim." Smith v. Day, 148 Vt. 595, 597, 538 A.2d 157, 158 (1987) (quotation omitted). We conclude that the City was entitled to summary judgment on plaintiffs' claims, although parts of our decision rest on different grounds than those identified by the trial court. See Hudson v. Town of E. Montpelier, 161 Vt. 168, 170, 638 A.2d 561, 563 (1993) (recognizing that Supreme Court need not adopt trial "court's rationale in affirming its conclusion"). We conclude as a matter of law that the City is immune from plaintiffs' negligence, trespass, and nuisance claims because it was exercising discretionary, policymaking authority when it designed the sewer/stormwater lines and when it decided to slip-line certain pipes rather than replace the lines entirely. As to plaintiffs' takings claim, we agree with the trial court that plaintiffs failed to present sufficient evidence to survive summary judgment. We thus affirm the court's decision.

## I. Immunity

### A. Governmental/Proprietary Distinction

¶ 9. We begin with the question of immunity. "Municipal immunity is a common-law doctrine dating back in Vermont to the mid 1800s." Hillerby v. Town of Colchester, 167 Vt. 270, 272, 706 A.2d 446, 447 (1997) (discussing history of municipal immunity). Vermont is one of few states that continue to distinguish between a municipality's "governmental" and "proprietary" functions in assessing whether a municipality is subject to tort liability. Id. "Absent insurance coverage, those functions which are governmental are protected by the doctrine of sovereign

4

immunity, while, in contrast, the governmental unit will be liable for injuries caused or sustained in furtherance of its proprietary functions." Dugan v. City of Burlington, 135 Vt. 303, 304, 375 A.2d 991, 992 (1977). "The rationale for this is that municipalities perform governmental responsibilities for the general public as instrumentalities of the state; they conduct proprietary activities only for the benefit of the municipality and its residents." Hillerby, 167 Vt. at 272, 706 A.2d at 447. We have long held that the "construction" and "repair" of sewer systems are proprietary functions. Winn v. Vill. of Rutland, 52 Vt. 481, 491-93 (1880) (concluding that municipality has "duty to exercise ordinary care and skill in the construction of sewers" and once constructed, has duty "to keep it in repair," but not addressing whether municipality could be liable "by reason of any fault in the general system of sewerage adopted, or in the plan and location selected for the sewer in question," which "would merit more extended consideration"); Fuller v. City of Rutland, 122 Vt. 284, 286-87, 171 A.2d 58, 59 (1961) (citing Winn and concluding that municipality was engaged in proprietary function when employees dug hole in road in attempt to locate sewer; reiterating that "building and maintaining" sewers is proprietary function). "The general rule is that where a municipality assumes the management of its sewer system, it is bound to use reasonable diligence and care to see that such sewer is not clogged with refuse and is liable for negligence in the performance of such duty to a property owner injured thereby." Stoneking v. Orleans Vill., 127 Vt. 161, 166-67, 243 A.2d 763, 766 (1968).

¶ 10. We have continued to adhere to the governmental/proprietary distinction although it "has been criticized by courts and commentators for many years as unworkable." Hudson, 161 Vt. at 177 n.3, 638 A.2d at 567 n.3 (recognizing that "Vermont is one of a minority of states that retains the governmental-proprietary distinction"). We have reasoned that despite its "inherent difficulties," this "doctrine strikes the best available balance between the municipality's need to function for the good of its citizens and the injured tort victim's right to recover from such injuries," and "[i]t ensures that the municipality's sovereign immunity is not applied so broadly

5

that it denies unnecessarily a remedy to a party injured by a municipality's actions." Vt. Gas Sys., Inc. v. City of Burlington, 153 Vt. 210, 214, 571 A.2d 45, 48 (1989).

B. Discretionary-Function Immunity

¶ 11.   At the same time, however, courts have long recognized a distinction between a municipality's planning and design decisions regarding sewer and water systems and its acts of constructing and maintaining such systems.  See Winn, 52 Vt. at 491 (recognizing distinction).  As the U.S. Supreme Court has explained:

> The duties of the municipal authorities in adopting a general plan of drainage, and determining when and where sewers shall be built, of what size and at what level, are of a quasi judicial nature, involving the exercise of deliberate judgment and large discretion, and depending upon considerations affecting the public health and general convenience throughout an extensive territory; and the exercise of such judgment and discretion in the selection and adoption of the general plan or system of drainage is not subject to revision by a court or jury in a private action for not sufficiently draining a particular lot of land.  But the construction and repair of sewers, according to the general plan so adopted, are simply ministerial duties; and for any negligence in so constructing a sewer, or keeping it in repair, the municipality which has constructed and owns the sewer may be sued by a person whose property is thereby injured.

Johnston v. District of Columbia, 118 U.S. 19, 20-21 (1886).

¶ 12.   This form of immunity is distinct from the governmental/proprietary distinction discussed above.  See Restatement (Second) of Torts § 895C cmt. g (1979); see also Owen v. City of Independence, 445 U.S. 622, 644-50 (1980) (discussing these two distinct common law doctrines that afford municipal corporations some measure of protection from tort liability, and explaining that governmental/proprietary distinction is grounded on principle of sovereign immunity while discretionary-decision immunity is based on concern for separation of powers); 18 E. McQuillan, Municipal Corporations, § 53:63 (3d ed.) ("[T]he discretionary-ministerial distinctions is grounded in concerns over the constitutional separation of powers rather than in the

6

common-law sovereign immunity rule which grounds the governmental-proprietary distinction.").

The Restatement explains:

> [A]s in the case of a State, a local governmental entity is immune in the exercise of those administrative functions that involve the making of a basic policy decision. Sometimes referred to as the exercise of a "discretionary function," as decisions made at the planning level or as the forming of an executive judgment, these are to be distinguished from the routine administrative activities in the operation of the government. The application of the immunity here is not simply a carry-over of the concept of a governmental function as distinguished from a proprietary function, but is based on the theory that some governmental functions are of a type that should not be subject to review and second-guessing by the courts in a tort action. As a practical matter courts may find fewer of these functions at a municipal level than at a federal or state level.

Restatement (Second) of Torts § 895C cmt. g (citations omitted); see also Chabot v. City of Sauk Rapids, 422 N.W.2d 708, 711 (Minn. 1988) ("Where the policy-making involves a balancing of social, political, or economic considerations, the conduct is immune as a discretionary function."); Tarbell Adm'r Inc. v. City of Concord, 956 A.2d 322, 327 (N.H. 2008) (recounting that New Hampshire Supreme Court abrogated municipal immunity with exception of discretionary-function immunity, which is "premised upon the notion that certain essential, fundamental activities of government must remain immune from tort liability so that our government can govern," and discretionary-function doctrine "is tailored to satisfy the underlying policy of preserving and respecting our system of separation of powers" (quotations omitted)); Butler v. Jordan, 2001-Ohio-204, 750 N.E.2d 554, 571 n.10 (Cook, J., concurring) (explaining that political subdivisions are immune from liability for "certain acts which go to the essence of governing, i.e., conduct characterized by a high degree of discretion and judgment in making public policy choices" (quotation omitted)).[2]

---

[2] We note that some states, like Ohio and Minnesota, have codified discretionary-function immunity.

¶ 13.     Vermont has explicitly adopted the discretionary-function exception for tort claims against the State.  As set forth in 12 V.S.A. § 5601(e)(1), the State is protected from any claim "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty on the part of a State agency or an employee of the State, whether or not the discretion involved is abused."  "The purpose of the discretionary-function exception is to assure that courts do not invade the province of coordinate branches of government through judicial second guessing of legislative or administrative policy judgments."  Estate of Gage v. State, 2005 VT 78, ¶ 4, 178 Vt. 212, 882 A.2d 1157 (quotation omitted).

¶ 14.     In Estate of Gage, we concluded that the State's decision not to place a guardrail around a brook that lay more than thirty feet from the edge of the driving lane fell within the discretionary-function exception.  In reaching this conclusion, we applied a two-part test, asking whether "the acts involved [were] discretionary in nature, involving an element of judgment or choice" and if so, "whether that judgment involved considerations of public policy which the discretionary function exception was designed to protect."  Id. ¶ 5 (quotations omitted).  We determined that the State had discretion whether to guard against hazards that lay outside a particular clear zone, and this decision required consideration of numerous factors, including financial and environmental considerations.  Id. ¶ 6.  We emphasized that this "determination involved precisely the kind of policy judgments—the weighing of risks, financial costs, and environmental and aesthetic impacts—that the discretionary-function exception was designed to protect."  Id. ¶ 7. "[W]here there is room for policy judgment and decision," we explained, "there is discretion."  Id. (quotation omitted).

¶ 15.     In reaching our conclusion, we rejected the plaintiff's argument that mere "routine ministerial tasks" were at issue, such as the removal of a beaver dam near the brook or the modest extension of a guardrail.  Id. ¶ 12. We explained that "[m]inisterial maintenance decisions of the kind suggested by [the] plaintiff have been described as the mere implementation of a previous

8

policy decision, or routine periodic maintenance mandated by explicit policy." Id. (quotations omitted). We concluded that even if "the physical removal of a beaver dam . . . represent[ed] a routine maintenance operation, the actual decision to do so represent[ed] a policy judgment based on experience and the weighing of multiple factors." Id. "This is precisely the kind of policy judgment that the discretionary-function exception was designed to protect from judicial second-guessing." Id. (citing Baum v. United States, 986 F.2d 716, 724 (4th Cir. 1993) (holding that alleged negligence in maintaining guardrail posts implicated, at bottom, a decision "of how and when" to replace elements of highway system that was "inherently bound up in considerations of economic and political policy" within the discretionary-function exception)). We distinguished cases holding that the discretionary-function exception was inapplicable to "maintenance failures," finding that these cases were "based on the absence of any evidence of an underlying policy judgment." Id. ¶ 14.

¶ 16. We have similarly recognized "the vital public interest in the free and independent judgment of employees charged with the duty of making public policy decisions" in the context of qualified official immunity, which is based in part on a "rationale . . . related to the doctrine of separation of powers." Hudson, 161 Vt. at 173, 173 n.1, 638 A.2d at 565, 565 n.1 (recognizing that "many of the purposes of official immunity also apply to sovereign immunity, including concerns over the separation of powers of coordinate branches of government"); Morway v. Trombly, 173 Vt. 266, 272, 789 A.2d 965, 969 (2001) (recognizing that Vermont courts have applied doctrine of qualified official immunity to cases involving municipal employees). "Courts will generally not hold legislative or executive employees personally liable for policy decisions that are based on factors such as availability or allocation of public resources or public acceptance because traditional tort standards do not provide an adequate basis for evaluating these types of decisions in coordinate branches of government." Hudson, 161 Vt. at 173-74, 638 A.2d at 565. As examples, we cited cases involving the "designing and planning of a highway," which

9

depended upon, among other things, "considerations such as the funds available for the project" and "the evaluation of technical data regarding safety," as well as other types of decisions that "require[] exercise of discretion regarding available funds and priority of projects." Id. at 174, 638 A.2d at 565 (citations omitted).[3]

¶ 17. In Hillerby, this Court considered "[w]hether the traditional governmental/proprietary distinctions in municipal tort immunity law should be replaced with the so-called private-analog test as now employed in state tort claims under 12 V.S.A. § 5601." 167 Vt. at 272, 706 A.2d at 446. We discussed the history of municipal immunity in detail and ultimately concluded that the Legislature, rather than the Court, should be provided "the initial opportunity to fashion a more reasonable and workable doctrine." Id. at 276, 706 A.2d at 449. In reaching our conclusion, we noted that "the Legislature tailored the private-analog test with exceptions and limitations that this Court [was] in no position to define and compel in the area of municipal immunity." Id. at 275, 706 A.2d at 448. We did not directly address the discretionary-function exception, although both dissenting Justices did.

---

[3] We are not here concerned with the "public duty rule," which "holds that a municipality does not have an enforceable duty to any particular individual for failure to enforce or comply with laws intended to benefit the public at large," with an exception for cases "where a municipal agent and a particular individual have a 'special relationship' under which an independent duty to the individual arises through reliance or dependence." 18 E. McQuillan, supra, § 53:4; see also 2 D. Dobbs, The Law of Torts § 345 (2d ed. 2011) (discussing public duty doctrine); 18 E. McQuillan, supra, § 53:18 (discussing public-duty rule and special relationship exception).

In Hudson, we declined to adopt the public-duty doctrine as a defense to negligence cases against individual municipal employees. 161 Vt. at 176, 638 A.2d at 566 (concluding that "[i]n the absence of the public duty doctrine or a statute specifically limiting liability, a municipal employee who commits a tortious act is personally liable to the injured person, even though the employee is engaged in a governmental function and the municipality is exempt under the doctrine of sovereign immunity"); cf. Corbin v. Buchanan, 163 Vt. 141, 143-45, 657 A.2d 170, 172 (1994) (concluding that town could not be liable for failure to enforce fire code because duty was owed to "the public as a whole," and citing public-duty-rule cases from other jurisdictions); see also Hillerby, 167 Vt. at 278, 706 A.2d at 278 (Dooley, J., dissenting) (discussing Vermont's "interesting recent history with [public-duty] rule").

10

¶ 18. In his dissent, Justice Dooley advocated eliminating the governmental/proprietary distinction and "tailor[ing] our law on municipal immunity to the modern policy reasons for recognizing such immunity," including "preserv[ing] separation of powers and protect[ing] certain executive-branch decision-making from second-guessing in the judiciary." Id. at 276-77, 706 A.2d at 449 (Dooley, J., dissenting). He noted that "all New England states extend municipal immunity to discretionary acts" even if "they differ on the scope of discretionary acts that are covered by immunity." Id. at 281, 706 A.2d at 452 (citing cases).

¶ 19. Justice Johnson advocated "abolish[ing] general municipal immunity along with the governmental/proprietary distinction, but continu[ing] to protect local government bodies from being sued for their legislative, judicial and high-level policy decisions, and for their failure to follow up on regulatory duties imposed to protect the general public." Id. at 282, 706 A.2d at 453 (Johnson, J., dissenting). She observed that "[e]ven those courts declaring that they were abrogating municipal immunity stated that municipalities would continue to be immune for their acts or omissions connected with legislative, judicial, and high-level executive policy decisions." Id. at 289, 706 A.2d at 457 (citing W. Keeton, Prosser and Keeton on the Law of Torts, § 131, at 1052 (5th ed. 1984), and citing cases). Justice Johnson maintained that "[t]o preserve separate and coequal branches of government that best serve the public's interests, government officials must feel that they can use free and independent judgment, without the threat of liability hanging over them, regarding decisions involving the balancing of priorities or the allocation of resources." Id. at 290, 706 A.2d at 457 (citing cases and 18 E. McQuillan, supra, §§ 53.04.10 and 53.04.20, at 156-57 and 162 (stating that tort law does not provide adequate framework to analyze governmental actions where real questions are not negligence, due care, or reasonableness, but rather social wisdom, political practicability, and economic expediency; decisions requiring balancing of priorities and weighing of budgetary considerations are kinds of political acts that courts ought not to second-guess and that are not readily judged by traditional tort standards)).

¶ 20. We do not read <u>Hillerby</u> to reject discretionary-function immunity for municipalities. As noted above, such immunity is distinct from the governmental/proprietary distinction and it has long been part of the common law. See, e.g., <u>Winn</u>, 52 Vt. at 491-92 (recognizing distinction for liability purposes between municipality's "duty to exercise ordinary care and skill in the construction of sewers" and duty "to keep it in repair" and its design and planning decisions); see also <u>Johnston</u>, 118 U.S. at 20-21 (distinguishing for liability purposes between municipality's planning and design of sewers and its construction and maintenance of such systems); W. Page Keaton, Prosser and Keaton on Torts § 131, at 1052 (5th ed. 1984) ("In both the states that have generally abolished immunity and the states that generally retain it subject to exceptions, it is agreed that the discretionary function or basic policy immunity remains as a shield against municipal liability."). We have never abolished discretionary-function immunity for municipalities and we explicitly acknowledge its existence here. It remains true, however, as we indicated in <u>Hillerby</u>, 167 Vt. at 276, 706 A.2d at 449, that it would be beneficial for the Legislature to act in this area.

## II. <u>Negligence Claim</u>

¶ 21. Turning to the instant case, we conclude as a matter of law that, like the types of decisions referenced above, the decisions at issue here—the design of the sewer system and the City's decision to slip-line the damaged pipes rather than replace the system entirely—"required a weighing of the type of public policy considerations that would warrant shielding [the City] from liability." <u>Hudson</u>, 161 Vt. at 175, 638 A.2d at 566. As the City stated in its motion for summary judgment, its sewage system is 100 years old and the City must prioritize expenditures related to this system mindful of, among other things, regulatory requirements, significant potential fines and costs, engineering recommendations, cost efficiencies including costs of road projects, and limited funds. The City alleged, and plaintiffs' expert agreed, that deciding the priority of projects is a matter of discretion, which involves judgment and the weighing of technical merit and

12

available resources. Additionally, as plaintiffs' expert agreed, there are various ways to address substantial root intrusion into clay pipes, including slip-lining, which is the least expensive alternative. The City's decisions to design the system to include a particular bend in a pipe—to whatever degree it is actually bent—and to slip-line rather than replace the vitrified clay pipes entirely were within its discretion, and separation of powers concerns compel the conclusion that the City is immune from negligence liability for these decisions.

¶ 22. Our conclusion that these decisions are best characterized as planning and design decisions rather than "maintenance" issues is informed by Gage and by cases from other states. The decision on how best to upgrade the pipes, once they were found to be in disrepair, "represented a discretionary policy judgment rather than a ministerial maintenance decision." Gage, 2005 VT 78, ¶ 15. The City's decision how best to address the identified problem required it to balance "safety, cost, and environmental factors," as well as other federal and state restrictions on its actions. Id. ¶ 16.

¶ 23. Plaintiffs believe that the pipes should be of a greater diameter and that there should not be a bend of a certain degree in a particular pipe. "When remedying a problem would require a city to, in essence, redesign or reconstruct the sewer system, then the complaint presents a design or construction issue." Essman v. City of Portsmouth, 2010-Ohio-4837, ¶ 32, 2010 WL 3852247 (Ct. App. 2010). As in one of the cases discussed in Essman, plaintiffs' true complaint here is "that the city failed to update the sewer system" as opposed to a "negligent maintenance" theory. Id. ¶ 36. There is no suggestion that any particular "maintenance" would have prevented the damages here. The issue is redesigning the system. Indeed, as part of their requested relief, plaintiffs seek a permanent injunction ordering the City to "design, construct, and maintain a reasonable and adequate remedy to the storm/wastewater system in the vicinity of [their] property so that they are not put in peril of future losses and damages from storm water and/or wastewater." The proper design of the City's sewer system must be left to the City. It is appropriate to "limit

13

judicial interference with legislative and executive decision-making, because to accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations." Tarbell, 956 A.2d at 327 (citations, quotations, and alteration omitted).

¶ 24. Other courts have reached similar conclusions. In Chabot, for example, a homeowner sued a city for property damage resulting from flooding from a holding pond that was part of the city's storm drainage system. 422 N.W.2d at 711. The court held that the city's decision not to make major capital improvements to the existing drainage system was an immune discretionary function. Id. at 710-11; see also Smith v. Stormwater Mgmt. Div., 676 N.E.2d 609, 612-13 (Ohio Ct. App. 1996) (per curiam) (concluding that decision to make improvements to existing sewer involves exercise of judgment and discretion); Milwaukee Metro. Sewerage Dist. v. City of Milwaukee, 2005 WI 8, ¶ 9, 691 N.W.2d 658 (Wis. 2005) ("Decisions concerning the adoption, design, and implementation of a public works system are discretionary, legislative decisions for which a municipality enjoys immunity," and this includes "the selection of the specific type of pipe, the placement of the pipe in the ground, and the continued existence of such pipe," but recognizing that city "may be liable for its negligence in failing to repair [a] leaky water main"). Thus, for the reasons set forth above, we conclude as a matter of law that the City is immune from plaintiffs' negligence claim here.

### III. Trespass Claim

¶ 25. The trial court concluded that plaintiffs' trespass claim failed because they failed to allege an intentional act by the City. We acknowledge that there is authority for the proposition that an intentional act is not always required to sustain a trespass claim. See Restatement (Second) of Torts § 165 ("One who recklessly or negligently . . . enters land in the possession of another or causes a thing . . . so to enter is subject to liability to the possessor if . . . his presence or the

14

presence of the thing . . . upon the land causes harm to the land, to the possessor, or to a thing . . . in whose security the possessor has a legally protected interest."); see also Dial v. City of O'Fallon, 411 N.E.2d 217, 222 (Ill. 1980) ("[O]ne can be liable under present-day trespass for causing a thing or a third person to enter the land of another either through a negligent act or an intentional act."); Capital Candy Co. v. City of Montpelier, 127 Vt. 357, 359, 249 A.2d 644, 645 (citing Griswold v. Weathersfield Town School Dist., 117 Vt. 224, 226, 88 A.2d 829, 830 (1952) for proposition that "[t]he fact that the damage to the plaintiff's property may have been in some way related to a public function does not excuse a neglectful trespass").  But see Griswold, 117 Vt. at 226, 88 A.2d at 830 (concluding that plaintiff stated takings claim against defendant school district, which had exploded dynamite near plaintiff's spring while searching for public-school water supply, thereby diverting stream and destroying plaintiff's interest in spring water).  Cf. Canton v. Graniteville Fire Dist. No. 4, 171 Vt. 551, 552, 762 A.2d 808, 810 (2000) (mem.) (discussing intentional trespass and recognizing that intentional interference with flow of surface water through redirection of it "is a form of conduct that may result in a trespass or nuisance").

¶ 26.    To fall within the rule identified by the Restatement,

> the conduct of the actor either must involve an unreasonable risk of invading the possessor's interest in his exclusive possession of the land or some other interest connected with it, or must be caused by an abnormally dangerous activity carried on by the actor which, although carefully carried on, involves a risk of invading such an interest.

Restatement (Second) of Torts § 165 cmt a.

¶ 27.    We need not address whether we should adopt the provision of the Restatement cited above.  We conclude that in this case, plaintiffs' trespass claim is simply a restated version of their negligence claim and that the City is immune from this claim as well.  See Tarbell, 956 A.2d at 330 (concluding that although city was entitled to discretionary function immunity for negligence claims based on its decisions regarding the "management of [a] dam and water supply,"

15

plaintiff's claim of <u>intentional</u> trespass and nuisance were not "restated versions of the negligence claim asserted" where plaintiff alleged deliberate invasion of property by city and private-nuisance claim alleged that city "used its property in an unlawful or unreasonable manner"); <u>Hurley v. Port Blakely Tree Farms L.P.</u>, 332 P.3d 469, 478-79 (Wash. App. 2014) (explaining that just as "a negligence claim presented in the garb of nuisance need not be considered apart from the negligence claim," so too does court treat "claims for trespass and negligence arising from a single set of facts as a single negligence claim" (quotations omitted)).

¶ 28.    In their complaint, plaintiffs asserted that, due to the City's negligence, sewage, wastewater, and water entered their properties.  This essentially restates their negligence claim. There is no allegation that the City acted intentionally nor, as discussed in greater detail below, is there any evidence to show that any intentional trespass by the City upon plaintiffs' property "amount[ed] to a physical taking of the property."  Cf. <u>Tarbell</u>, 956 A.2d at 330 ("The actionability of intentional infliction of harm to property interests, like inverse condemnation, trespass, and the concept of nuisance, has constitutional underpinnings in the restraint on the taking of private property for public use without just compensation." (quotations and brackets omitted)).  We thus conclude as a matter of law that, like the negligence claim, plaintiffs' trespass claim against the City is barred.

IV. <u>Nuisance</u>

A. Plaintiff's Claim

¶ 29.    We thus turn to plaintiffs' nuisance claim.  Plaintiffs alleged in their complaint that the City's "conduct, actions and/or inactions . . . created a nuisance that substantially and unreasonably interferes with [their] right to use and enjoy their properties."  They also asserted that the City's conduct "constitutes a breach of duty to the plaintiffs."  The behavior at issue is apparently the City's allegedly flawed design of the system and its decision to slip-line the pipes. It appears that the alleged nuisance is the "continued intrusion of . . . sewage into [plaintiffs']

16

homes and the damage it causes both at the time and in decreasing the market value or marketability of their homes," which plaintiff allege "is caused by the City's decision to spend its money on other projects." Plaintiffs asserted in their opposition to summary judgment that prior to the 2014 incidents, the City had notice of what appears to be a 1986 backup in the Daly home and a 2007 backup in the Lorman home.

## B. Immunity

¶ 30.  We have not yet addressed whether, and when, a municipality can be held liable on a nuisance claim under circumstances similar to these.  Different treatises appear to endorse different approaches, sometimes within the same discussion, and case law reflects a variety of opinions on this question.  See, e.g., 18A McQuillan, supra, § 53:77.21 ("Claims of nuisance per se and intentional nuisance in fact are not barred by governmental immunity.  However, in other jurisdictions, claims of intentional nuisance are barred, as are claims of public nuisance." (footnotes omitted)); id. § 53:151 ("There is a conflict in the jurisdictions as to the liability for inadequate sewers or drains.  Sometimes the governing law is not harmonious even in the same state.").

¶ 31.  McQuillan states that "[i]n jurisdictions that still provide tort immunity for municipalities under the governmental-proprietary distinction, there has long been an exception for nuisances."  Id. § 53:77.21.  "One rationale is that nuisances involving damage to private property resemble unconstitutional takings.  Another rationale is that life-threatening conditions created by the municipality ought not be treated as mere negligence."  Id. (footnotes omitted).  McQuillan also recognizes, however, that "[a]s a matter of law, particular municipal acts may constitute negligence rather than intentional nuisance," and that "[a] single isolated occurrence or act, which if regularly repeated would constitute a nuisance, is not a nuisance until it is regularly repeated."  Id.; see also Kellogg v. City of Albia, 908 N.W.2d 822, 829 (Iowa 2018) (observing that "[t]he distinction between nuisance and negligence claims is often important because common

17

law nuisance generally exists as a separate area of recovery from negligence only when the danger at issue is inherent in the activity and not the results of the negligent conduct").

¶ 32.   A different treatise, The Law of Torts, provides an analysis that we find compelling here.   Dobbs posits that, stated bluntly, "a nuisance claim based on negligence is merely a negligence claim with harm to interests in use and enjoyment."  2 D. Dobbs, The Law of Torts, § 400, at 622-23.  He continues:

> When a public entity creates a nuisance, some courts will reject common law immunities and subject the entity to liability. However, because a nuisance claim based on negligent acts is merely a claim of negligence that causes loss of use and enjoyment of land, the logical result is that immunity depends on whether the defendant's negligent acts called for immunity, not on the nuisance label itself.  Thus if a city negligently creates a nuisance but its negligent acts are discretionary, it would enjoy the discretionary immunity.  Of course, to the extent that the conduct exceeds the city's immunity, suit will be permitted.

Id. at 623 (footnotes omitted).  Dobbs cites, among other cases, Tarbell, 956 A.2d 322, where the New Hampshire Supreme Court held that a city's decisions regarding water levels in its reservoir and the appropriate number of outlets for the reservoir were discretionary and immune from suit but the claim that the city negligently maintained its drainage system fell outside discretionary immunity as did the claim that the city's nuisance and trespass amounted to a taking.  See also Milwaukee Metro. Sewerage Dist., 2005 WI 8, ¶ 8 (holding that "municipality is immune from suit for nuisance if the nuisance is predicated on negligent acts that are discretionary in nature" but not when "negligence is comprised of acts performed pursuant to a ministerial duty").  But see Bostco LLC v. Milwaukee Metro. Sewerage Dist., 2013 WI 78, ¶¶ 3, 33, 835 N.W.2d 160 (Wisc. 2013) (citing Milwaukee Metro but concluding that defendant's "maintenance of [a] continuing private nuisance is not a legislative, quasi-legislative, judicial or quasi-judicial function," and thus, no immunity applies, and stating that "duty to abate a nuisance negligently maintained, of which one has notice, is a general common law obligation," which applies to municipalities).  There are

18

numerous additional cases addressing these issues, which reflect various approaches. See, e.g., Kellogg, 908 N.W.2d at 829 (concluding that city was statutorily immune from homeowner's nuisance claim, which was based on recurring basement flooding from storm sewer, because conduct supporting nuisance claim (negligent design and construction or failure to upgrade) was immunized by statute, and homeowner failed to show that harmful condition creating nuisance was inherent in operation of storm-sewer system itself or identify any negligent conduct beyond that immunized by statute); Miller v. City of Wentzville, 371 S.W.3d 54, 57 (Mo. Ct. App. 2012) ("Inverse condemnation is the exclusive remedy when private property is taken or damaged without compensation as a result of a nuisance operated by an entity that has the power of eminent domain."); Schroeder v. Ely City Mun. Water Dep't, 910 P.2d 260, 261-62 (Nev. 1996) (under Nevada law, no action may be brought against officer or employee of state or any of its agencies or political subdivisions based upon (1) failure to inspect public works to discover hazards or deficiencies, even if duty to inspect exists, or (2) failure to discover hazard or deficiency whether or not inspection made, but public entity not entitled to this immunity if it "had knowledge of a hazard and fails to act reasonably to correct such hazard"); City of Dallas v. Jennings, 142 S.W.3d 310, 316 (Tex. 2004) (rejecting homeowners' action against city to recover on takings and nuisance theories for damage to their home as result of city's efforts to unclog sewer line, explaining that "nuisance liability arises only when governmental immunity is clearly and unambiguously waived" and no such waiver here, and noting that "[i]n some cases, the Tort Claims Act may waive immunity from certain nuisance claims," and "[i]n other cases, a city may be held liable for a nuisance that rises to the level of a constitutional taking").

¶ 33.     We agree with Dobbs that logic dictates that the City is immune from plaintiffs' nuisance claim, which is essentially a restated version of plaintiffs' negligence claim. The claim rests on negligence and the same discretionary acts discussed above. Allowing this claim to proceed would lead to the same result that the discretionary-function immunity is designed to

19

avoid: having the court second-guess the City's discretionary decisions regarding the design of the sewer system. We thus conclude as a matter of law, based on discretionary-function immunity, that judgment was properly granted to the City on this claim.

## V. Takings Claim

¶ 34. Finally, we address plaintiffs' takings claim. Plaintiffs assert that based on their evidence, a reasonable jury could find that the backups were a direct or probable result of the slip-lining or angling. Plaintiffs argue that they have been forced to bear a public burden in the form of their neighbors' wastewater in their basements, and that they, unlike other City residents, must disclose to potential purchasers that there is an unresolved sewer problem nearby. Citing Winn, 52 Vt. at 494-95, plaintiffs suggest that a taking has occurred because the usefulness of their property has been impaired.

¶ 35. The government cannot take private property for public use "without just compensation." See U.S. Const. amend. V ("[N]or shall private property be taken for public use, without just compensation."); Vt. Const. ch. I, art. 2 ("[P]rivate property ought to be subservient to public uses when necessity requires it, nevertheless, whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money."); see also Ondovchik Family Ltd. P'ship v. Agency of Transp., 2010 VT 35, ¶ 14, 187 Vt. 556, 996 A.2d 1179 (recognizing that "the federal and Vermont Constitutions use virtually the same test for takings review"). The City is not immune from takings claims. See Tarbell, 956 A.2d at 330; see also Griswold, 117 Vt. at 226, 88 A.2d at 830 (stating that doctrine of immunity from liability for governmental activities "does not apply where the injury complained of is the taking of private property for public use without compensation" (citing cases and other authority)). For a property loss to be compensable as a taking, the government must "intend[] to invade a protected property interest or the asserted invasion [must be] the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." Ondovchik Family

Ltd. P'ship, 2010 VT 35, ¶ 16 (quotation omitted); see also Matter of Chicago, Milwaukee, St. Paul & Pacific, 799 F.2d 317, 325-26 (7th Cir. 1986) ("Accidental, unintended injuries inflicted by governmental actors are treated as torts, not takings.").

¶ 36.  "[T]he United States Supreme Court [has] highlighted the importance of 'distinguishing between cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other." Ondovchik Family Ltd. P'ship, 2010 VT 35, ¶ 15 (quoting Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 428 (1982) (alterations omitted)).  Although "temporary, repeated incursions can sometimes rise to the level of a taking," the incursions must "amount to the taking of an easement."  Id. ¶ 18; see also Henderson v. City of Columbus, 827 N.W.2d 486, 496 (Neb. 2013) (concluding that plaintiffs, whose basement was flooded once by raw sewage during rainstorm, did not establish taking). "When the intrusion is limited and transient in nature and occurs for legitimate governmental reasons, it does not amount to a taking."  Ondovchik, 2010 VT 35, ¶ 18 (quotation omitted).  To the extent that we suggested otherwise in Winn, that suggestion is no longer good law.  See 52 Vt. at 494 (stating that village authorities had no "right to make the lands of the plaintiff a place of deposit for the sewage of the village, creating there a cesspool and nuisance, and endangering the lives of the plaintiff and his family, without first making compensation therefor," and "[s]uch use of the plaintiff's lands amounts to a taking of his land within the purview of the constitutional requirement that compensation shall be made").

¶ 37.  The undisputed facts here show that the sewage backups on plaintiffs' property have been intermittent, limited, and transient.  The Gallaghers have had one backup since 2007 and the Lormans have had two.  The Dalys have had five backups between 1983 and 2014 with the closest backups occurring four years apart.  While no backup is insignificant, the backups occurred intermittently over a long period of time, and we conclude that this does not suffice to

21

show a taking under the law.  Based on the undisputed facts, the City was entitled to summary judgment on this claim.

      <u>Affirmed</u>.

                                  FOR THE COURT:


_____
Chief Justice